UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SHANE M. GATES,<br>　　　　　　　　　**Plaintiff,**<br><br>*versus*<br><br>**SHERIFF RODNEY JACK STRAIN,**<br>*et al.,*<br>　　　　　　　　　**Defendants.** | **CIVIL ACTIONS**<br>**NOS. 07-6983 and 13-6425**<br><br><br>**JUDGE STANDWOOD R. DUVALL, JR.**<br><br>**MAGISTRATE JUDGE**<br>**JOSEPH C. WILKINSON, JR.** |

**PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF MOTION FOR INJUNCTION AND TO LIFT STAY**

MAY IT PLEASE THE COURT:

　　The Plaintiff herein, **Shane M. Gates**, through his undersigned counsel, respectfully files this Memorandum in Support of his contemporaneous Motion to Lift Stay and for Injunction.

## I.  Factual and Procedural History

　　This case arose on the evening of November 16, 2006, when Nathan Miller, an off-duty St. Tammany Parish Sheriff's Deputy, stopped a Pontiac GTO being driven by Shane Gates.  Although Deputy Miller later testified that he had observed that vehicle's driving recklessly and at high speed, the Sheriff's Office dispatch tapes—which that department first hid from discovery by the defense and then altered before producing them—when examined by an audio expert revealed that Miller had been pursuing a dark four-door vehicle but eventually, and for reasons that have never been explained, stopped a dark two-door one.  Further, while Miller claimed he had been pursuing that four-door for miles down Interstate 12, the evidence adduced at trial showed he actually stopped Mr. Gates only 0.6 miles and one minute after he first called his dispatcher.

(The undisputed testimony of several third-party witnesses was that until 19 minutes prior to Deputy Miller's stop,[1] Mr. Gates had spent the entire afternoon at an auto dealership in Slidell, completing the purchase of a new car, during which time he had nothing whatever to drink. Thus, if the State's later claims were true, that when Deputy Miller stopped him, he had a blood-alcohol level of 0.273%, this would have required that during those 19 minutes he would not only have had to have driven himself from Slidell to the site of the traffic stop in Lacombe, something which was just barely possible within the time parameters, but in addition, during those same 19 minutes would also have had to have consumed the incredible amount of between 10 to 20 beers or mixed drinks.)

After Deputy Miller stopped Mr. Gates, he handcuffed him and placed him in his cruiser. Then two on-duty deputies, Roger Gottardi and Brian Williams, arrived on the scene, after which Deputy Gottardi removed Mr. Gates from Deputy Miller's car, smashed his face into the hot hood of Deputy Gottardi's vehicle, then threw Mr. Gates—still handcuffed—to the ground, smashing his face into the roadway paving several times and causing massive injury to Mr. Gates. Pictures of Mr. Gates' injuries are attached hereto as Exhibit "A".

A shift supervisor, then-Sheriff's Lieutenant Randy Smith (now himself Sheriff of St. Tammany Parish and therefore administrator of the department budget that is potentially liable for the $500,000 insurance deductable on Mr. Gates' civil claim) arrived on the scene and directed that Mr. Gates be taken to the nearby Louisiana Heart Hospital in Lacombe, Louisiana, for treatment of his injuries. There, Mr. Gates received preliminary treatment for his injuries and the emergency room physician determined that his facial injuries were so extensive that he should be transported to another facility where an on-call plastic surgeon would be available properly to

---

[1] The time of Mr. Gates' leaving the dealership was independently verified by the timestamp on the "Fuelman" printout from a gas pump at which the dealership filled up Mr. Gates' new car as he was leaving the dealer's lot in Slidell.

SMG Memo in Suppt of Mtn 4 Injunctn & 2 Lift Stay

repair the damage Deputy Gottardi had inflicted.  However, although the Louisiana Heart Hospital is located midway between Covington, Louisiana and the St. Tammany Parish Hospital, and Slidell, Louisiana and Slidell Memorial and Ochsner Hospitals there, at any of which a plastic surgeon could have been expected to be available, the E.R. nurse (who later testified against Mr. Gates at the felony trial and whose testimony on many critical points was contradicted by that of the E.R. physician on duty) arranged instead for him to be transported past those two Slidell hospitals and on many, many miles further to a hospital in Hattiesburg, Mississippi where his own wife worked.

There, in fact, no surgical specialist was available and Mr. Gates was eventually sewn up by an ordinary emergency room physician, something that could have been done more quickly, cheaply, and practically at the emergency room where he first landed.  However, this absurd, wasteful, and unnecessary transport did assure that Mr. Gates did not present himself at any of the St. Tammany Parish hospitals, all of which had policies that required the local municipal police to be called when a patient arrived with injuries of the type Mr. Gates displayed.  Further, Lt. Smith also personally called off the Louisiana State Police officers who were *en route* to the Lacombe hospital to deliver the mandatory State-approved blood sampling kit that is required under the Louisiana Administrative Code for the prosecution of any traffic offense involving alleged alcohol intoxication.  Thus no blood alcohol test certified as required by the Louisiana State Police Crime Lab was ever performed on Mr. Gates, meaning that the State has no objective evidence of intoxication to support its charge of DWI.

What the State does allege occurred at the Lacombe hospital was an ordinary hospital blood test for alcohol, ordered by the emergency room physician for purposes of medical treatment, not by a law enforcement officer for purposes of prosecuting a traffic violation.  However,

no witness has ever testified that any such test was, in fact, performed; the most the State was able to show was the testimony of one E.R. nurse who stated that he drew a blood sample—without Mr. Gates' permission—and then left that ampoule on a desk in the emergency department, which was the last he ever saw of it.  That hospital has never produced that sample or any chain of custody for it, or any evidence that any test was actually run on it, or any of the required maintenance and calibration logs that are required by the Louisiana Administrative Code for testing equipment that is to be used in traffic enforcement cases.

Nor did the technician who allegedly tested that sample—but who was indisputably not certified to do so for law enforcement purposes, as required by La. Admin. Code 55:551-565—never testified as to anything he might have done that night, because during the lengthy delays in the State's first bringing to trial any of the charges against Mr. Gates, that potential witness died. The unavailability of the only person who had personal knowledge of whether a test—even though, for the State's purposes an unlawful, uncertified test—was or was not performed is one of several irreparable harms Mr. Gates has suffered as direct results of the State's nearly six-year delay in first bringing him to trial on the events in question.

On the night he was stopped and beaten, Mr. Gates was issued ordinary traffic citations for DWI, resisting arrest, and having an open container of alcohol in a vehicle, all of which did not ripen into formal charges until the following month.  At that time, Ronnie Gracianette, a St. Tammany Parish Assistant District Attorney, "screened" the charges and signed an interoffice form "accepting" a misdemeanor charge of DWI and a felony charge of unlawful flight to avoid prosecution.  That felony charge eventually went to a jury trial in July, 2012 but no misdemeanor charge was ever set for trial, nor was ever the subject of any motion for a continuance or other delay, until well after that felony trial concluded.  This is significant for present purposes be-

cause throughout the proceedings below, Mr. Gates filed numerous motions asserting his speedy trial claims, all of which were ignored by the state trial judge and never set for hearing, and by statute Louisiana requires all misdemeanors to be tried within one year after of the institution of charges, La. Code Crim. Proc. Art. 578.  Thus that DWI charge was already stale and time-barred more than four years prior to the commencement of the felony trial and the resisting arrest charge was similarly stale and time-barred more than three years prior to the commencement of that trial.

The State's inattention to these misdemeanor charges was clearly explained by ADA Ronnie Gracianette's later testimony that, having billed Mr. Gates for one felony charge under La. Rev. Stat. 14:108.1 that carried the heaviest potential sentence available, he had no real interest in other misdemeanor charges, whether the original DWI charge he did "accept" or the resisting arrest charge first suggested by Deputies Gottardi and Williams on the traffic ticket but which he did not "accept", and which he only later "accepted" at the behest of St. Paul Travelers' and on the strength of the forged "victim letter" that St. Paul Travelers gave him but that had purportedly been authored by Deputy Miller.  (*See* **Rec. Doc. 225-1**, which is incorporated by reference herein as this Memorandum's Exhibit "B".)

Daniel G. Abel, one of Mr. Gates' defense counsel, testified that, subsequent to ADA Gracianette's billing Mr. Gates on the felony flight charge, Mr. Abel had several conversations with Charles M. Hughes, Jr., one of the attorneys for St. Paul Travelers, the insurer for the St. Tammany Parish Sheriff's Office.  Mr. Hughes told Mr. Abel that if Mr. Gates filed a "Rodney King"-style § 1983 suit against the Sheriff's Office over his beating, then Hughes would see to it that further charges of resisting arrest were instituted, because under the then-prevailing interpretation of federal case law, a conviction or plea on that charge would completely bar any recovery

for excessive force.  When Mr. Abel did file the first of the instant § 1983 suits on Mr. Gates'

behalf, Mr. Hughes requested Mr. Gracianette to add or "accept" a new or additional misde-

meanor charge (depending on one's view of the events of December, 2006) of resisting arrest in

an attempt to bar Mr. Gates' civil recovery.  (A copy of the relevant portions of Mr. Abel's tes-

timony on May 10, 2010 is attached hereto and incorporated herein by reference as this Memo-

randum's Exhibit "C".)

   Of course, Mr. Hughes' threat to Mr. Abel to use a criminal prosecution to obtain an ad-

vantage in Mr. Gates' civil suit was completely and utterly unethical, and itself constituted bad

faith in the institution and maintenance of that prosecution.  Three further aspects of this transac-

tion, both at the time unknown to Mr. Gates' defense, also bear directly on the issue of the

State's bad faith in this same matter.  One is that, at this time, Walter Reed, then the St. Tam-

many Parish District Attorney, was conducting his personal civil law practice through the New

Orleans firm of McCranie, Sistrunk, Anzelmo, Hardy, McDaniel & Welch.  A second is that, at

this same time but again unknown to the defense, McCranie, Sistrunk regularly represented St.

Paul Travelers, so that Walter Reed personally had a direct financial incentive to benefit St. Paul

Travelers by using his office as District Attorney to assist in St. Paul Travelers' defense of Mr.

Gates' suit.  As a direct result of that, Walter Reed and his entire office also had an irreparable

conflict of interest in handling the charges against Mr. Gates, but he never recused himself or his

office from this case.  This, too, is a further example of the bad faith that fatally infects these par-

ticular criminal charges; it is black-letter law that *federal* due process standards not only guaran-

tee a party against *actual* improprieties in the conduct of litigation but also against even the *ap-

pearance* of impropriety.

In this connection, this Court will be all too aware that, as this Memorandum is being filed, Walter Reed has been convicted on eighteen felony counts of misconduct in office, is currently awaiting sentencing for those crimes, and several of those charges arose from his regular practice of manipulating his public office as District Attorney to divert large sums in "legal fees" to himself, using as a conduit therefore his allegedly "private" law practice.

The third fact relevant to Mr. Hughes' procuring the resisting arrest charge that was then unknown to the defense is that when he approached Mr. Gracianette, and told him St. Paul Travelers wanted a resisting arrest charge to be lodged, Mr. Gracianette told him he would do so only if one of the Sheriff's Deputies involved in the case requested him to do so.  Mr. Hughes, to induce Mr. Gracianette to comply with St. Paul Travelers' request, on the same day ADA Gracianette informed him of the requirement for a "victim letter" before the resisting arrest charge would be "accepted", returned that same day and produced a letter conforming to Gracianette's specifications that purported to have been written and signed by Deputy Nathan Miller, the original officer making the traffic stop.  This was addressed to the DA's Office and, on its face, requested that a resisting arrest charge be filed.  (*See* **Rec. Doc. 225-4**, a copy of this letter which is incorporated by reference herein as this Memorandum's Exhibit "D".  *See also* **Rec. Doc. 225-6**, Mr. Hughes' own testimony about this transaction, which is incorporated by reference herein as this Memorandum's Exhibit "E".)

However, according to Deputy Miller's own later testimony, he was ***never*** asked to provide any such letter and he ***never*** prepared or signed one.  (*See* **Rec. Doc. 225-5,** which is incorporated by reference herein as this Memorandum's Exhibit "F".)  No evidence has ever been adduced to contradict Deputy Miller's testimony on this point.  Therefore, in plain English, the "victim letter" that St. Paul Travelers, through its lawyer, presented to ADA Gracianette, in order

to obtain the institution of criminal charges to assist St. Paul Traveler's defense of Mr. Gates'
civil suit, was a *forgery*.  This is a just one more clear and glaring instance of bad faith in the
State's current attempt to bring up for prosecution the long-expired DWI and resisting arrest
misdemeanor charges against Mr. Gates.

     After Mr. Hughes and St. Paul Travelers presented the forged Miller "victim letter" to get
the resisting arrest charge added to the DWI charge, both of those charges then languished with-
out any attempt by the State to move either toward trial.  Neither was ever set for trial nor was
the subject of any hearing or action in the state trial court.  Thus, by the time the felony trial
opened in July, 2012, that resisting arrest charge had already passed the state's statutory one-year
deadline for a misdemeanor trial.  It is undoubtedly for that reason that, when the felony charge
of unlawful flight to avoid prosecution finally went to trial, the State had nothing to lose by using
such evidence as it had on both of those charges for tactical purposes in what was, technically, an
unrelated matter; where by that time those two minor charges themselves could not lawfully be
brought to trial.

     At the felony trial, the State apparently never expected Mr. Gates to take the stand in his
own defense.  But after the State rested its case in chief, he did so, as well as presenting the wit-
nesses from the car dealership who showed that he had not been drinking that day and other evi-
dence that showed Deputy Miller's account of the events leading to the traffic stop was a physi-
cal impossibility.  Therefore, in order to rebut that defense, on the final day of trial the State
sought to bring forward the evidence on which the State relied both to establish its claim that Mr.
Gates was intoxicated and that, although already handcuffed and in Deputy Miller's cruiser, he
had resisted Deputy Gottardi's beating him to a pulp.

The defense objected to the introduction of any evidence regarding alleged intoxication, which the trial court upheld.  The State therefore took an overnight emergency writ to the state Court of Appeal for the First Circuit, which ruled that the tainted evidence must be admitted. Mr. Gates therefore filed his own overnight emergency writ application to the Louisiana Supreme Court, which denied his application.  This is important because, under Louisiana's "law of the case" doctrine, the constitutional claims Mr. Gates raised in his trial court exception and in his state supreme court writ application would not be reconsidered on any appeal from a criminal conviction.  Thus he has already exhausted his state remedies with respect to these issues and is, therefore, in the same status as an applicant to this Court for post-conviction relief from violations of his federally-guaranteed constitutional rights.

On July 27, 2012, after notice of the Supreme Court's denial of Mr. Gates' writ application, the trial resumed and the State put on its case in rebuttal of Mr. Gates' defense.  (*See* **Rec. Doc. 225-3**, the transcript of that day's evidence, which is incorporated by reference herein as this Memorandum's Exhibit "G".)  As that Exhibit shows, while the issues of alcoholic intoxication and resisting arrest are not among the essential elements of the felony crime of unlawful flight, the State nevertheless put on ***all*** of its evidence on both those issues, *i.e*., everything it would have offered in evidence had it ever timely set them for trial.  The obvious purpose in introducing this otherwise irrelevant evidence was to try to prejudice the jury against Mr. Gates by, it hoped, painting him as a "bad actor", a drunk and a fighter who would, therefore, seem more likely to have fled from a police officer than would a more compliant citizen.

But despite the State's best efforts, when the jury retired, it took less than a half hour to return a general verdict of "not guilty".  (*See* **Rec. Doc. 225-2**, the jury verdict form, which is incorporated by reference herein as this Memorandum's Exhibit "H".)  Having thus submitted to

the jury all of its evidence on both issues of intoxication and resisting arrest, either inadvertently or by calculation based on those issues' lapse by time, and having had a general verdict of "not guilty" returned thereon, the State triggered the "evidentiary fact" branch of the U.S. Supreme Court's Double Jeopardy jurisprudence.

It was only after the jury exonerated Mr. Gates that the State, for the very first time, gave some thought to trying to set the stale DWI and resisting arrest misdemeanors for trial.  Even though by that time, of course, those charges were nearly six years old, having passed both the state statutory and federal jurisprudential time limits, and even though during the felony proceedings Mr. Gates had continuously resided in St. Tammany Parish and, moreover, had been personally present in court on more than 44 occasions, on any one of which he could have been served with a notice of trial, the State never set a trial on the misdemeanor charges and never issued a notice of trial regarding them until after August, 2013, long past the statutory deadline for bringing misdemeanors to trial and, most significantly, until after the felony trial jury had already found Mr. Gates not guilty on the flight charge upon which the State had, for nearly six years, been pinning its hopes.

After the State—for the first time—attempted to set those stale charges for trial, and while it was making ineffectual efforts to serve Mr. Gates personally with notice thereof, his defense counsel filed in the trial court a motion to quash those charges on the grounds of double jeopardy and denial of due process.  The 22nd Judicial District Court, the Louisiana Court of Appeal for the First Circuit, and the Louisiana Supreme Court all declined to enforce Mr. Gates' constitutional rights (the two appellate courts without giving any written reasons for their nonfeasance), for which reason he is, again, standing before this Court in the same essential situation

as would a defendant who has been convicted in the state courts, had that conviction affirmed, and is now seeking collateral post-conviction vindication of his violated constitutional rights.

Subsequently former Supreme Chief Justice Pascal Calogero and co-counsel filed a motion to quash concerning the double jeopardy and speedy trial violations in the 22nd JDC which was denied by the trial court, took writs to the 1st Circuit Court of Appeal, and the Louisiana Supreme Court, each of which were denied without any written reasons. Mr. Gates has sought relief from these violations of his constitutional rights in the state courts, which did not give him such under the state or federal constitution.

Mr. Gates filed his initial § 1983 civil lawsuit against the Sheriff and the other Defendants in 2007, while the felony prosecution was pending; as noted above, it was the filing of this suit that led St. Paul Travelers to procure the resisting arrest charge against him.  Then in 2008 the State moved to stay the civil case until it finished its prosecution of Mr. Gates on all charges. This Court noted at the hearing on that motion that it was granting a stay of the case but only for a limited period of time because it was obvious that Mr. Gates was handcuffed when he was beaten.

After the May 10, 2010 state court hearing, at which the fact of St. Paul Travelers' role in instituting the resisting arrest charge was revealed, Mr. Gates filed in 2011 his own motion in this Court to lift the stay and proceed with his civil suit.  At that time, this Court denied his motion because the felony case had not yet gone to trial.

In August, 2013, Mr. Gates filed the second § 1983 suit here, based on additional acts of fraud that had come to light in the interim, such as the forged "victim letter" purporting to have been signed by Deputy Nathan Miller that St. Paul Travelers obtained and presented to ADA Ronnie Gracianette to get the resisting arrest charge "accepted".  The Defendants were served

with that second suit but did not answer it, so Mr. Gates took default judgments against them. The Defendants then moved to set those defaults aside and to reimpose the stay while they attempted to proceed with the now seven-year-old misdemeanors that they hoped would serve as bars to the "Rodney King" § 1983 civil actions.

On October 20, 2016, the Defendants filed in this Court a new and utterly unprecedented motion (**Rec. Doc. 211**), seeking a partial lifting of the stay combined with an order (for which bizarre relief no possible authority or precedent was ever cited), directing Mr. Gates to surrender himself to the same St. Tammany Parish Sheriff's Office that had already beaten him unmercifully and which had never disciplined the rogue officer who did so, in default of which they requested this Court to dismiss his civil actions.  The face of this motion and its supporting memoranda reveal beyond any reasonable doubt that the motion was filed, and the unprecedented relief requested was planned, not out of any legitimate motive of enforcing the State's interest in a criminal prosecution—and especially in a criminal prosecution that the State itself had abandoned many years before—but, instead, out of purely mercenary motives, in order to give an unlawful, unfair, and utterly unethical advantage to the St. Tammany Parish authorities in their defense of a civil suit, in blatant bad faith as well as in violation of Rule 8.4(g), R. Prof. Cond., which forbids threatening or maintaining a criminal prosecution for the purpose of obtaining an advantage in a civil suit.  And this unethical genesis of the misdemeanor charge of resisting arrest, at least, goes all the way back to Charles Hughes' admission that St. Paul Travelers procured that charge for precisely that purpose.  And, being incurably unethical and infected with fatal conflicts of interest, the continuation of those misdemeanor charges is likewise in objective bad faith.

After a hearing on December 14, 2016 on the Defendants' most recent motion, this Court ordered that Mr. Gates file, by January 23, 2017, this instant motion to enjoin the state criminal prosecution and to lift the stay (**Rec. Doc. 237**).

## II.  Law and Argument.

**A.     While considerations of federal-state comity under the Eleventh Amendment usually lead the federal courts to decline to enjoin state-court criminal proceedings, there is a narrow list of recognized exceptions to that policy.  Shane Gates' case fits squarely within those exceptions, one of which is when the request for an injunction arises out of an action to vindicate federally-guaranteed civil rights and the state criminal proceedings violates the Fifth Amendment's guarantee against being twice placed in jeopardy on the same criminal matters.**

Where state officials use, or threaten to use, state criminal proceedings, the maintenance of which would violate fundamental U.S. Constitutional rights of the defendants, then despite the Eleventh Amendment, the federal courts may protect those federally-guaranteed rights by enjoining and restraining those state officers from continuing with state-law enforcement actions:

> "[J]urisdiction of this general character has, in fact, been exercised by Federal courts from the time of *Osborn v. Bank of United States* up to the present; the only difference in regard to the case of *Osborn* and the case in hand being that in this case the injury complained of is the threatened commencement of suits, civil or criminal, to enforce the act, instead of, as in the *Osborn* Case, an actual and direct trespass upon or interference with tangible property.  A bill filed to prevent the commencement of suits to enforce an unconstitutional act, under the circumstances already mentioned, is no new invention, as we have already seen. The difference between an actual and direct interference with tangible property and the enjoining of state officers from enforcing an unconstitutional act, is not of a radical nature, and does not extend, in truth, the jurisdiction of the courts over the subject-matter.  In the case of the interference with property, the person enjoined is assuming to act in his capacity as an official of the state, and justification for his interference is claimed by reason of his position as a state official.  Such official cannot so justify when acting under an unconstitutional enactment of the legislature.  So, where the state official, instead of directly interfering with tangible property, is about to commence suits which have for their object the enforcement of an act which violates the Federal Constitution, to the great and irreparable injury of the complainants, he is seeking the same justification from the authority of the state as in other cases.  The sovereignty of the state is, in reality, no more involved in one case than in the other.  The state cannot, in either case, impart to

the official immunity from responsibility to the supreme authority of the United States.  *See Re Ayers*, 123 U. S. 507, 31 L. ed. 230, 8 Sup. Ct. Rep. 164."

*Ex parte Young,* 209 U.S. 123, 167, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

Aside from the Eleventh Amendment, one of the other principle obstacles to such federal injunction suits is the Anti-Injunction Act, 28 U.S.C. § 2283 *ff*:

> "The Anti–Injunction Act ("the Act") states that '[a] court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'  28 U.S.C. § 2283 (2000).  Consequently, one of the limited exceptions to the Act is when a federal statute explicitly permits a federal court to enjoin a state proceeding.  *Mitchum v. Foster,* 407 U.S. 225, 226, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).
> "As Petitioner asserts, the federal habeas statute, 28 U.S.C. § 2251 ('Section 2251'), is one of the few statutes that authorizes a federal court to stay proceedings in state court.  *See e.g., McFarland v. Scott,* 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994)."

*Schillaci v. Peyton,* 328 F.Supp.2d 1103, 1104 (D. Hawaii 2004).  Of particular importance is that the U.S. Constitutional right that gave rise to the injunction issued in *Schillaci* was the Fifth Amendment guarantee against **double jeopardy**, precisely the right that would be violated by the instant Defendants' proceeding against Mr. Gates on their misdemeanor charges in St. Tammany Parish.

The other similar obstacle is the "Younger abstention doctrine", which the *Schillaci* court explained thusly:

> "In addition [to the Eleventh Amendment], the court must consider whether enjoining Petitioner's state criminal proceedings would violate the *Younger* abstention doctrine.  The *Younger* doctrine arises from the Supreme Court's decision in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).  In *Younger,* the Supreme Court reversed a federal court's decision to enjoin a state criminal prosecution because the decision violated the 'national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances.'  *Id.* at 41, 91 S.Ct. 746.  The Court based its decision on the established doctrine that a court of equity should not interfere with a state criminal prosecution when the moving party has an adequate remedy available and would not suffer irreparable injury.  *Id.* at 43-44, 91 S.Ct. 746.  More-

over, the Court stated that it coupled this consideration with 'an even more vital consideration, the notion of "comity," that is a proper respect for state functions." *Id.* at 44, 91 S.Ct. 746.

"Exceptions to the *Younger* doctrine are very limited, but several do exist. In *Younger,* the Court identified three particular exceptions:  1) when there has been a bad faith state prosecution; 2) when there is a patently unconstitutional state law; or 3) when an adequate state forum does not exist in which to raise a constitutional issue.  *Id.* at 53-54, 91 S.Ct. 746.  The Court also noted that '[t]here may, of course, be extraordinary circumstances in which necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment.'  *Id.* at 53, 91 S.Ct. 746.

"The Ninth Circuit has recognized that a successive prosecution in state court would constitute the type of extraordinary circumstances which would permit a federal court to enjoin a state proceeding, notwithstanding the *Younger* abstention doctrine.  In *Mannes v. Gillespie*, the Ninth Circuit stated that '[a] claim that a state prosecution will violate the Double Jeopardy Clause presents an exception to the general rule of *Younger*....'  967 F.2d 1310, 1312 (9th Cir. 1992) (citations omitted).  The court explained that this exception arises because the Double Jeopardy clause does not seek to prevent an individual from being punished twice; it seeks to prohibit an individual from being placed in jeopardy twice.

"With regard to the instant case, the court agrees with Petitioner that if Petitioner is convicted in the second state court proceeding, overturning the conviction would not be a complete remedy, as Petitioner would have already been placed in jeopardy twice.  In *Hartley v. Neely,* the Ninth Circuit made clear that 'a petitioner in state custody can only be assured freedom from double jeopardy by giving him access to habeas review prior to a second trial.'  701 F.2d 780, 781 (9th Cir. 1983).  As a result, in the instant case, Petitioner will incur irreparable injury if the state proceedings are not enjoined.  Petitioner's circumstances constitute an exception to the *Younger* abstention doctrine."

*Schillaci, supra,* at 1105.  Accordingly, where Mr. Gates has exhausted his remedies in the state courts and is threatened with irreparable injury to his Fifth Amendment double jeopardy rights, it is both appropriate and necessary for this Court to protect those rights by enjoining the Defendants from proceeding with the two pending misdemeanor prosecutions.

**B.**   **Were the St. Tammany officials to be permitted to proceed in the name of the State of Louisiana to prosecute Mr. Gates on the pending DWI and resisting arrest misdemeanors, they would thereby compel him unconstitutionally to run the gantlet they first made him run at the July, 2007 felony trial, where they attempted to prejudice the jury against him by putting on all of their available evidence of both his alleged alcoholic intoxication and of his alleged resisting arrest—evidence that jury rejected by returning a general verdict of "not guilty".**

The U.S. Supreme Court has explained the "double jeopardy" guarantee in these terms:

> "The ultimate question to be determined, then, in the light of *Benton v. Maryland*, [395 U.S. 784, 89 S.Ct. 2056], is whether this established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy. We do not hesitate to hold that it is. For whatever else that constitutional guarantee may embrace, *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, it surely protects a man who has been acquitted from having to 'run the gantlet' a second time. *Green v. United States*, 355 U.S. 184, 190, 78 S.Ct. 221, 225, 2 L.Ed.2d 199.
> "…
> "In this case the State … treated the first trial as no more than a dry run for the second prosecution: 'No doubt the prosecutor felt the state had a provable case on the first charge and, when he lost, he did what every good attorney would do he refined his presentation in light of the turn of events at the first trial.' But this is precisely what the constitutional guarantee forbids."

*Ashe v. Swenson*, 397 U.S. 436, 445-447, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

There are two branches of the "double jeopardy" doctrine, the first and more familiar of which deals with situations where a defendant has been tried, and either convicted or acquitted, of one offense, and the government then attempts to prosecute him on a second charge—such as a lesser-included offense—for which the essential elements of the first crime were included among the essential elements of the second one. This was the situation confronted in, for example, the leading case of *Green v. United States*, cited above in the extensive quotation from the *Ashe* court.

There is, however, another, rather rarer branch of this doctrine, which deals with what the courts have termed "evidentiary facts". This is where the state has prosecuted a defendant on one offense, that prosecution has ended in an acquittal by the trier of fact, and the government

then attempts to pursue a second action against him where, although the essential elements of the

second offense do not overlap with those of the first one, the evidence actually presented at each

of the trials does so.

This was the situation in *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107

L.Ed.2d 208 (1990), where the Government of the U.S. Virgin Islands prosecuted Dowling for

an armed robbery and, at trial, introduced evidence of an earlier, and separate robbery which it

contended he had committed—and for which he had been acquitted.  Noting that the identity of

the robber in the first case was not an essential element required to be proven in the second one,

the Supreme Court upheld the admission of that evidence:

> "Our decision is consistent with other cases where we have held that ***an
> acquittal in a criminal case does not preclude the Government from relitigating
> an issue when it is presented in a subsequent action governed by a lower stan-
> dard of proof***.  In *United States v. One Assortment of 89 Firearms,* 465 U.S. 354,
> 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), for example, we unanimously agreed that
> a gun owner's acquittal on a charge of dealing firearms without a license did not
> preclude a subsequent *in rem* forfeiture proceeding against those firearms, even
> though forfeiture was only appropriate if the jury in the forfeiture proceeding con-
> cluded that the defendant had committed the underlying offense.  Because the for-
> feiture action was a civil proceeding, we rejected the defendant's contention that
> the Government was estopped from relitigating the issue of the defendant's al-
> leged wrongdoing:
>
> "'[The acquittal did] not prove that the defendant is innocent; it merely
> proves the existence of a reasonable doubt as to his guilt. . . .  [T]he jury verdict in
> the criminal action did not negate the possibility that a preponderance of the evi-
> dence could show that [the defendant] was engaged in an unlicensed firearms
> business. . . .  It is clear that the difference in the relative burdens of proof in the
> criminal and civil actions precludes the application of the doctrine of collateral es-
> toppel.' *Id.,* at 361-362, 104 S.Ct., at 1104.
>
> "In *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 235, 93
> S.Ct. 489, 492, 34 L.Ed.2d 438 (1972), it was also held that the Double Jeopardy
> Clause did not bar a forfeiture action subsequent to acquittal on the underlying of-
> fense because 'the difference in the burden of proof in criminal and civil cases
> precludes application of the doctrine of collateral estoppel.'  *Helvering v.
> Mitchell*, 303 U.S. 391, 397, 58 S.Ct. 630, 632, 82 L.Ed. 917 (1938), likewise ob-
> served that '[t]he difference in degree in the burden of proof in criminal and civil
> cases precludes application of the doctrine of *res judicata.*'"

*Dowling, supra*, at 349-350 (emphasis supplied).

Thus the dispositive test is whether the state's proposed second use of the same evidence that a jury previously rejected is itself governed by the higher, criminal standard of "proof beyond a reasonable doubt" or by the lower, civil standard of "proof by a preponderance of the evidence". Mr. Gates' situation is the precise opposite of that presented in Dowling: here, while the State did not need to present its evidence of intoxication and resisting arrest in order to demonstrate the essential elements of aggravated flight to avoid prosecution, it nevertheless chose to do so as a tactical advantage. Now, however, it seeks to use that same evidence which has already been submitted to a jury's general verdict of acquittal to prove the essential elements of DWI and resisting arrest, all of which are *now* required to be proven "beyond a reasonable doubt". Thus under the *Dowling* test, the State's proposed reuse of that same evidence is now barred by the "evidentiary fact" branch of the double jeopardy principle. Mr. Gates has presented these issues to the Louisiana courts, through a motion to quash in the trial court and writ applications in the Court of Appeal and Supreme Court, and has been denied relief for his double jeopardy rights. Thus he has exhausted his state remedies and is now entitled to federal *habeas* protection against being again placed in jeopardy with respect to that same evidence.

**C.     The St. Tammany officials' bad faith in seeking to proceed to trial against Mr. Gates on the pending DWI and resisting arrest misdemeanors is shown not only by the corrupt way the resisting arrest charge was procured by the Parish's liability insurer but also by the fact that they know perfectly well that the misdemeanor charges have long since passed the permissible delays for bringing them to trial, both under Louisiana state statute and under federal constitutional due process standards.**

Louisiana Code of Criminal Procedure, Article 578, provides in its entirety:

"Art. 578   General rule
"A. Except as otherwise provided in this Chapter, *no trial shall be commenced nor any bail obligation be enforceable:*

"(1) In capital cases after three years from the date of institution of the prosecution;

"(2) In other felony cases after two years from the date of institution of the prosecution; and

"**(3) In misdemeanor cases after one year from the date of institution of the prosecution.**

"B. The offense charged shall determine the applicable limitation."

[Emphasis supplied.]  Mr. Gates was arrested on November 16, 2006 and the state court felony trial concluded on July 27, 2012, more than five years and eight months after that arrest.  During that entire time, Mr. Gates was continuously resident in St. Tammany Parish, his residence address was on file with the state trial court, and he was personally present in court in connection with the felony case on at least forty-four (44) occasions, on any one of which he could have been served with a notice of hearing or trial on those misdemeanor charge, provided only that any such hearing or trial ever been set.

However, throughout that five years and eight months that elapsed between Mr. Gates' arrest and the conclusion of his felony trial, at no time were those **misdemeanor** charges **ever** set for trial or hearing.  Where they were never set for trial, then of course no notice of any trial date regarding them was ever issued by the state trial court and so, of course, no such notice was ever served, either upon Mr. Gates himself or upon any of his counsel of record.  Thus the running of the time-bar period under La. Code Crim. Proc. 578(A)(3) was never interrupted and thus, too, the State's statutory one-year window of opportunity to try Mr. Gates on those misdemeanor charges closed, at the latest, in December, 2007, long before his felony trial even commenced, let alone concluded.

Throughout the entire five years and eight months that elapsed between Mr. Gates' arrest and the conclusion of his felony trial, both the State and he requested one or more continuances in the **felony** case but Mr. Gates **never** requested **any** continuance of any trial or hearing on those

*misdemeanor* charges.  (Nor would he have had any occasion to request any such continuance, inasmuch as no hearing or trial was ever set regarding them.)  Thus, by the plain terms of La. Code Crim. Proc. 578(A)(3), as of the conclusion of the felony trial, the State was already at least four years and eight months too late to take Mr. Gates to trial upon any misdemeanor charges that might have remained unresolved.  *See, e.g., State v. Paul*, 2011-1347 (La. App. 4th Cir. 10/3/2012) (unpublished).

In addition to the time bar imposed by La. Code Crim. Proc. 578(A)(3), the State's own voluntary delay of any misdemeanor trial violated Mr. Gates' due process right to a speedy trial as guaranteed by U.S. Constitution, Amendments VI and XIV.  The United States Court of Appeals for the Fifth Circuit has defined the contours of the federally-guaranteed due-process right to a speedy trial in *Amos v. Thornton,* 646 F.3d 199 (5th Cir. 2011), applying the rule laid down in *Barker v. Wingo*, 407 U.S. 514, 521–22, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).  In *Thornton*, it held that after a one-year's delay in bringing a criminal charge to trial, the federal courts must analyze state criminal proceedings to see if they comply with federal due process standards.  After eighteen months' delay, in the *Barker* analysis that delay is considered strongly to favor the defendant and to weigh against the State.

In that same *Barker* analysis, after five years' delay in bringing those charges to trial, the federal courts are to presume that the state's failure to proceed to trial timely has caused harm to the defendant, without further proof of such damage.  But in the instant case, quite apart from that automatic presumption of damages, there is no doubt that such actual damage has accrued through the state's unwarranted delay, including, without limitation:  (a) the death in 2007 of the hospital laboratory technician who purportedly performed the blood alcohol test on which the State relies, thus making him unavailable for testimony or to be cross-examined; and (b) the

State's failure to preserve the actual blood alcohol sample that was taken from Mr. Gates at Louisiana Heart Hospital on the day of his arrest.  This failure makes it impossible for him to obtain any confirmatory testing by an independent third-party expert.  Thus, under the *Amos* rule, and quite apart from the issues of the double jeopardy involved in any future trial the misdemeanor charges and the State's failure to comply with La. Code Crim. Proc. 578(A)(3), as a matter of federally-protected constitutional due process, the State is barred from now proceeding on them against Mr. Gates.

**WHEREFORE,** Shane Gates respectfully requests this Honorable Court to grant his Motion to Lift Stay and for Injunction, freeing Mr. Gates to proceed with his pending § 1983 action against the Defendants and enjoining and restraining those same civil Defendants from proceeding with the misdemeanor charges against Mr. Gates of DWI and resisting arrest that those Defendants contend are still pending in the 22nd Judicial District Court, St. Tammany Parish, Louisiana, on the grounds that the continued delay of and interference with his § 1983 action is unjust and improper and that those Defendants' attempts to maintain those long-time barred misdemeanor charges cause him irreparable harm by violating his Fifth Amendment rights against double jeopardy and to due process and his Sixth Amendment rights to a speedy trial and to the opportunity to confront his accusers.

  */s/ J. A. Hollister*
**JOHN A. HOLLISTER (La. Bar #6963)**
613 Bon Temps Roulé
Mandeville, Louisiana 70471
(985) 792-5353
jahollister@yahoo.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the above and foregoing pleading was filed electronically with the Clerk of the United States District Court for the Eastern District of Louisiana on January 23, 2017, and pursuant to the instructions of that Clerk is being re-filed on January 24, 2017, using that Court's CM/ECF system, which system will send a notice of electronic filing to appearing parties in accordance with the Court's established policies and procedures.

*/s/ J. A. Hollister*

**JOHN A. HOLLISTER**